2016 DEC 19 AM 11: 49


## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the
General Receivership of


JACOB G. BUTTNICK,
David DeLaittre, as Personal
Representative of the Estate of
Jacob G. Buttnick, deceased,

Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 73742-2-I

UNPUBLISHED OPINION

FILED: December 19, 2016

DWYER, J. — Today we are called upon to answer whether, when a property owner periodically resides in his commercial building, the owner must establish that the building is his principal place of residence in order to qualify for a homestead exemption. The answer is yes.

I

This case comes to us after an evidentiary hearing in superior court, at which the validity of Jacob Buttnick's homestead claim was contested. The superior court judge entered extensive findings of fact. We have reviewed the record and each factual finding is supported by substantial evidence.

The facts of this case, as found by the superior court judge, are as follows:

1)      Plaintiffs Lance Miyatovich and Jolan, Inc. (hereinafter "Jolan Creditors") are creditors of the assignor in this cause of

action, Jacob Buttnick. Mr. Buttnick owned the J&M building, which is the real property at issue in this dispute.

2) On August 2, 2012, the Jolan Creditors and Mr. Buttnick entered into a CR 2A settlement agreement to resolve pending claims the creditors asserted against him. In the settlement agreement, Mr. Buttnick admitted liability on all claims. The settlement required Mr. Buttnick to: (1) allow the Jolan Creditors immediately enter judgment against him for $510,000, (2) satisfy the $510,000 judgment no later than August 2, 2013, and (3) pay the Jolan Creditors $3,000 each month until he satisfied the terms of the settlement agreement.

3) In section 1(b) of the settlement agreement, Mr. Buttnick represented "that he has sufficient interest in the J&M building to fully fund this settlement agreement, and he agrees he will not encumber the building in an attempt to avoid funding this settlement agreement."

4) In section 1(g) of the settlement agreement, Mr. Buttnick represented the Creditors "shall be entitled to enter and impose a lien, lispendens [sic], and whatever other mechanism they deem necessary and appropriate to secure and protect their rights under this agreement, including an interest in the J&M building, and Buttnick agrees to cooperate in the execution of any such lien, lispendens [sic], or other mechanisms."

5) On August 8, 2012, the Court entered a $510,000 judgment against Mr. Buttnick on behalf of the Jolan Creditors, which was recorded on August 24, 2012. Mr. Buttnick failed to satisfy the other terms of the settlement agreement.

6) On June 20, 2013, the day before a scheduled foreclosure sale of the J&M building, and shortly before the deadline to fulfill his settlement obligations to the Jolan Creditors, Mr. Buttnick filed for receivership.

7) In his receivership filing, Mr. Buttnick assigned all of his assets to a receiver, including the J&M building, and authorized the receiver to market, sell, and otherwise liquidate all of his assets. In the schedules attached to his sworn assignment, Mr. Buttnick did not list any exemptions, including a homestead exemption.

8) The receiver eventually filed a motion to approve sale of the J&M building. Afterward, on November 19, 2013, Mr. Buttnick recorded a declaration of homestead in the J&M property and asserted he was living there. The declaration contained all of the elements required by RCW 6.13 .040(5), except that it was not notarized. The next day, November 20, 2013, Mr. Buttnick filed for Chapter 11 bankruptcy. In his bankruptcy filing, Mr. Buttnick also listed a homestead exemption on the property.

-2-

9) This was the first indication the Jolan Creditors had that Mr. Buttnick asserted he lived in the J&M building and claimed a homestead exemption.

10) Approximately four months later, on March 25, 2014, the bankruptcy court lifted its automatic stay imposed upon filing so the Jolan Creditors could obtain a supplemental judgment against Mr. Buttnick pursuant to the terms of the settlement agreement and judgment entered in 2012.

11) Approximately two weeks later, the bankruptcy court ordered the trustee to abandon the J&M building to allow creditors with a security interest in the property to enforce their state law rights. The bankruptcy court also dismissed the Chapter 11 proceeding.

12) On April 17, 2014, the Jolan Creditors obtained a supplemental judgment against Mr. Buttnick in the amount of $818,789.73, which, in combination with the initial judgment, amounts to a total judgment of $1,328,789.73 the Jolan Creditors hold against Mr. Buttnick. He has not fully satisfied this judgment. When asked at trial if he would waive his homestead claim pursuant to section 1(g) of the settlement agreement to secure the creditors' rights under the agreement, Mr. Buttnick declined.

13) After the bankruptcy proceeding was dismissed, Mr. Buttnick's creditors renewed their efforts to foreclose on the J&M building, and one secured creditor commenced an action to appoint a custodial receiver over the property. On May 23, 2014, however, Mr. Buttnick executed an assignment for the benefit of creditors in favor of Resource Transition Consultants, LLC ("RTC"). Under the terms of the assignment, Mr. Buttnick assigned scheduled assets (the "Estate") and authorized RTC to "take possession of and administer the Estate and shall liquidate the Estate." In the schedules attached to his sworn assignment the J&M building was listed as "Nonexempt Property".

14) Pursuant to the Assignment of Creditors, on June 2, 2014, RTC petitioned for and was appointed as general receiver to take charge over all of Mr. Buttnick's assets, with the power to sell the Estate property free and clear of liens.

15) The receiver testified that RTC learned of the Declaration of Homestead Mr. Buttnick had recorded in November 2013 when it conducted a title search on the J&M property. To be prudent, RTC got a sworn declaration from Mr. Buttnick in which he approved RTC's sale of the J&M property and again asserted that the J&M property "has continuously been my residence since 2007."

16) The Jolan Creditors timely objected to Mr. Buttnick's claim of homestead. Consequently, the Court entered an order requiring the receiver to reserve $125,000 from any property sale

proceeds until the disputed homestead claim could be resolved. The property now has been sold and the receiver has retained proceeds for these purposes.

17) Jolan Creditors challenge Mr. Buttnick's homestead claim on three bases: (1) that it is false, intended to defraud his creditors and not made in good faith; (2) that they relied to their detriment on promises Mr. Buttnick made to them in their settlement agreement that conflict with his homestead claim in the property, so he should be equitably estopped from asserting a homestead claim; and (3) that Mr. Buttnick has taken conflicting positions on the property in different judicial proceedings that have served to mislead both the creditors and the courts and, if an exemption is permitted, it would allow Mr. Buttnick to obtain an unfair advantage. Consequently, the Jolan Creditors argue, judicial estoppel bars his homestead claim. Jolan Creditors also renew their motion denied at the hearing to allow amendment of the petition to add a claim for specific performance, requiring Mr. Buttnick to waive his homestead claim pursuant to section 1(g) of their settlement agreement.

18) Mr. Buttnick asserts that his homestead claim is valid and enforceable.

19) Mr. Buttnick stated in both his recorded homestead declaration and the declaration he provided to the RTC receiver that he has resided at the J&M building since 2007, but the record establishes otherwise. First, he had a primary residence in the Seward Park neighborhood of Seattle that he lost to foreclosure in late 2010. Mr. Buttnick testified at the hearing that he misstated the date in his written declarations and he meant to state that the J&M building has been his primary residence since the 2010 foreclosure.

20) Witnesses testified in support of Mr. Buttnick's claim that they had been to his room at the J&M building on and off between 2010 and 2014, which contained a mattress on the floor, clothing, and some personal effects. Most visits occurred during the day time, primarily during a period when Mr. Buttnick was ill and eventually hospitalized, and again shortly before the building was sold in 2014 and all personal items had to be removed. An architect testified that when she toured the building, she suspected Mr. Buttnick stored personal items in the basement.

21) Others testified they never saw evidence Mr. Buttnick resided on the property, although he frequently could be found in one of the businesses on the ground floor. All witnesses, including those who testified in Mr. Buttnick's behalf, testified that the two upper floors of the building, where Mr. Buttnick's room was located, were unfit for human habitation. The building was constructed as a hotel in the 1800s, but the upper two floors have not been permitted

for residential use since 1972. The J&M is a commercial building. A restaurant and a bar operate on the street level; the upper two floors have no electricity, heat, or running water. There is a substantial amount of trash in the upper floors, which smells bad and has attracted rats, insects, and birds. Sections of the flooring and structure are rotted and unsafe.

22) In support of the exemption, Mr. Buttnick offered photographs into evidence that show a bed, clothing, and some personal effects in a small room. But the photographs also confirm that the room was in serious disrepair, far from meeting housing code requirements for occupancy. Mr. Buttnick testified that he jerry-rigged electrical wiring from downstairs for electricity, and that during his residency he used the bathroom in the restaurant and bathed at a shelter or the YMCA in the vicinity.

23) Other evidence contradicts Mr. Buttnick's homestead claim. In response to discovery requests in September 2010, Mr. Buttnick did not list himself when asked to identify all occupants of the building. In his February 2011 deposition, Mr. Buttnick stated under oath that he was living with a friend in the north end of Seattle. In March 2014, while showing the building to an inspector for the Seattle Department of Planning and Development, Mr. Buttnick told the Inspector he did not reside in the J&M building. Mr. Buttnick also testified that he lived on and off with several friends from 2010-2014, and that he purposely concealed his residency as he did not want others to know he stayed at the J&M.

The superior court also entered several pertinent conclusions of law:

3. Under Washington law, a homestead is protected in one of two ways: (1) by occupying the property as a person's principal residence, or (2) if not yet occupied, by executing a declaration of homestead as required by statute and recording it in the county where the property is located. RCW 6.13.040(1). Here, Mr. Buttnick purports to have used both procedures to assert his homestead exemption.

4. Mr. Buttnick recorded a declaration of homestead in the J&M property in King County on November 19, 2013. The Washington Supreme Court has held that a homestead declaration

is merely an act of the owner whereby he avails himself of, and secures, a right or privilege given to him by statute. The privilege thus sought and obtained is wholly a creature of, and its validity depends upon, a compliance with the statute that permits the homestead to come into existence.

U.S. Fidelity & Guaranty Co. v. Alloway, 173 Wash. 404, 406, 23 P.2d 408 (1933). In Alloway, the declaration was not notarized as

required by law. The statute as it existed in the 1930s and today requires that a declaration of homestead "be acknowledged in the same manner as a grant of real property is acknowledged." RCW 6.13.040(5). Accordingly, the *Alloway* Court determined the declaration never properly came into existence and it did not operate to establish the claimant's homestead. *Id.* at 407. The same is true here. Although the homestead declaration recorded by Mr. Buttnick contained most of the elements required by statute, it was not notarized. Consequently, as in *Alloway,* the homestead declaration is deficient and it did not operate to establish Mr. Buttnick's homestead in the J&M building.

5.    Mr. Buttnick also asserts he resided in the J&M building as his primary residence at the same time he recorded his homestead declaration. As noted above, if a person is actually residing in a principal residence, he is not required to record a declaration to claim the homestead. Nonetheless, Mr. Buttnick did so and the Court must determine if the Jolan Creditors have established that his claim of residency is invalid under the law.

6.    It is well-established that "homestead laws are not founded on principles of equity," but reflect a public policy to shelter a family home from financial misfortune and to encourage home ownership. *Clark* v. *Davis,* 37 Wn.2d 850, 852, 226 P.2d 904 (1951) (internal citations omitted). They are not intended to enable a person to simply escape liabilities or to perpetrate a fraud or injustice on others. *Id.* If a claimant intends to both avoid creditors and to make the property his home, the exemption is valid. *Id.* at 853. But if the claimant lacks a good faith intent to make the property his primary residence–a home–, the exemption is not valid. *Id* at 852-55 *(see also* cases cited therein).

7.    Here, it is established that Mr. Buttnick lived on and off in the J&M building, but the evidence also establishes that he never intended to make the J&M his primary residence. The evidence supports the conclusion that Mr. Buttnick "crashed" at the J&M when he had no other options. The building was not approved by applicable codes or fit to be a residence. Despite purporting to live there since 2010, Mr. Buttnick took no steps to make the small room in which he stayed more habitable. It contained a mattress on the floor, some clothing, and trash. Even if Mr. Buttnick did not have the funds to renovate the building, if he intended to make it his home, some effort would have been made over time to clear debris and rodents. As Mr. Buttnick testified, he deliberately denied that he stayed in the building, concealing this information from friends, creditors, and authorities. Although he lost his Seward Park home in 2010, Mr. Buttnick first made the homestead claim in 2013, more than a year after judgment was entered against him and while he was actively attempting to maximize his return from the sale of the

property. Mr. Buttnick's motivation is understandable. He no doubt found himself in dire straits that required him to stay at the property when he had no alternative, but this unfortunate situation does not support a finding that Mr. Buttnick held an honest intent to occupy the J&M building as his home. No evidence, other than Mr. Buttnick's assertions and sparse furnishings, supports such a finding.

     8.    Jolan Creditors also assert that Mr. Buttnick's homestead claim should be set aside on the bases of equitable and judicial estoppel. Having found that the exemption is invalid under the statute, the Court does not reach the arguments grounded in equity.

The superior court then ordered that Buttnick's homestead exemption was invalid. It further ordered the receiver to distribute the funds in its possession to the creditors.

Buttnick appeals from this ruling.[1]

II

A

The homestead exemption statutes were enacted for the purpose of providing a shelter for the family and an exemption for a home. Bank of Anacortes v. Cook, 10 Wn. App. 391, 395, 517 P.2d 633 (1974). Two statutes, RCW 6.13.010 and RCW 6.13.040, determine what constitutes and how to establish a homestead. RCW 6.13.010(1) defines a homestead for purposes of exemptions:

> The homestead consists of real or personal property that the owner uses as a residence. In the case of a dwelling house or mobile home, the homestead consists of the dwelling house or the mobile home in which the owner resides or intends to reside, with appurtenant buildings, and the land on which the same are situated and by which the same are surrounded, or improved or unimproved

---

[1] During the pendency of this appeal, Jacob Buttnick died. We grant the motion to substitute the personal representative of his estate as a party to this action.

land owned with the intention of placing a house or mobile home thereon and residing thereon. A mobile home may be exempted under this chapter whether or not it is permanently affixed to the underlying land and whether or not the mobile home is placed upon a lot owned by the mobile home owner. Property included in the homestead must be actually intended or used as the principal home for the owner.

RCW 6.13.040 both allows for an automatic homestead and sets forth when a homestead declaration is required:

(1) Property described in RCW 6.13.010 constitutes a homestead and is automatically protected by the exemption described in RCW 6.13.070 from and after the time the real or personal property is occupied as a principal residence by the owner or, if the homestead is unimproved or improved land that is not yet occupied as a homestead, from and after the declaration or declarations required by the following subsections are filed for record or, if the homestead is a mobile home not yet occupied as a homestead and located on land not owned by the owner of the mobile home, from and after delivery of a declaration as prescribed in RCW 6.15.060(3)(c) or, if the homestead is any other personal property, from and after the delivery of a declaration as prescribed in RCW 6.15.060(3)(d).

(2) An owner who selects a homestead from unimproved or improved land that is not yet occupied as a homestead must execute a declaration of homestead and file the same for record in the office of the recording officer in the county in which the land is located. However, if the owner also owns another parcel of property on which the owner presently resides or in which the owner claims a homestead, the owner must also execute a declaration of abandonment of homestead on that other property and file the same for record with the recording officer in the county in which the land is located.

Thus, "[i]f property that satisfies the basic description of a homestead is actually occupied by the owner as a principal residence, it is automatically protected as a homestead." 28 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES—DEBTORS' RELIEF § 7.24 (2016). However, the owner is required to file a declaration of homestead when: (1) the owner does not

yet occupy the unimproved or improved land as a homestead, (2) the homestead is a mobile home not yet occupied as a homestead and located on land not owned by the owner of the mobile home, or (3) the homestead is any other personal property. RCW 6.13.040.

When the homestead is developed and occupied as the principal residence, the nature of the homestead is directly evident by the owner's occupancy and no declaration is required. Conversely, a declaration of homestead is required when the homestead is undeveloped, in the process of redevelopment, or a mobile home because the owner's intent to make the land or property a homestead is not directly evident.

## B

The trial court ruled that Buttnick's homestead exemption was invalid because he did not live at the J&M building as his primary residence. The trial court based this ruling on a number of facts that it found to be true—that Buttnick stayed overnight at the J&M building only periodically, that he denied actually living there on numerous occasions, and that he never acted so as to manifest an intent to make the J&M building his primary home. On appeal, Buttnick takes issue with the court's ruling, asserting that the court erroneously required him to prove "both actual residence **and** intent to reside." Br. of Appellant at 6. This, Buttnick contends, wrongly required him to prove that he "intend[ed] to reside there forever." Br. of Appellant at 7. Buttnick's argument misconstrues the trial court's ruling.

Buttnick repeatedly asserts that his living in the building from time to time is sufficient to qualify for the homestead exemption, notwithstanding that he admits that his residence on the property was "suspect and spotty." Br. of Appellant at 12. However, because Buttnick claims to have resided at the J&M building, the plain language of RCW 6.13.010 mandates that the applicable standard is whether the property in question is the principal home of the property owner. Therefore, Buttnick's intent was relevant in determining whether Buttnick actually made the J&M building his primary home. This was the standard applied by the trial court. The trial court did not misinterpret or misapply the requirements of RCW 6.13.010.

C

Buttnick next asserts that, because the trial court found that he sometimes lived at the property, the trial court erred by refusing to validate his homestead exemption. Buttnick's contention is without merit.

"The trial court's credibility determination and its resolution of the truth from conflicting evidence will not be disturbed on appeal." Frank Coluccio Constr. Co. v. King County, 136 Wn. App. 751, 770, 150 P.3d 1147 (2007). Because the trial court has observed the witnesses and weighed the evidence, we review "factual matters to determine whether the trial court's factual findings are supported by substantial evidence, and, if so, whether the findings support the conclusions of law and judgment." Frank Coluccio Constr. Co., 136 Wn. App. at 761. The party claiming error has the burden of showing that substantial

evidence does not support a finding of fact. <u>Frank Coluccio Constr. Co.</u>, 136 Wn. App. at 761.

Buttnick's assertion that the trial court refused to allow him the homestead exemption in the proceeds of the sale of the property after finding that he resided in the building, is an incorrect restatement of the trial court's finding and ruling. In fact, the trial court acknowledged that Buttnick from time to time lived at the property but further found that he had never made the J&M building his principal residence, as required by RCW 6.13.010.

Substantial evidence supports the trial court's findings of fact. The trial court heard from a variety of witnesses, reviewed a number of exhibits, and made reasonable factual findings and legal conclusions pursuant to the applicable statute and the evidence presented at the hearing. The trial court was persuaded by substantial evidence that, although Buttnick may have lived at the J&M building from time to time, the J&M building was never Buttnick's primary residence.

In addition to being faithful to the language of the statute, the trial court's ruling was also faithful to the purpose of the statute. As was stated nearly a century ago, the applicable statute

> provides that the premises included in the homestead must be actually intended and used as a home for the claimant. The facts to which we have referred, in the light of the details gathered from careful examination of the record, convince us that appellant never intended in good faith to occupy the land as a home for himself and his son. His pretended residence was merely colorable, and the filing of the declaration of homestead was not for the purpose of establishing and maintaining a home, but was solely for the purpose of defeating his creditors.

. . . .

    The idea of *home* is the very foundation rock upon which all homestead laws are based, and unless it is the honest intention of the declarant to actually occupy the premises as a home, he is not within the protection of the statute. We are not unmindful of the rule that statutes of this character are not in derogation of the common law, but are to be liberally construed to the end that the wise and benevolent policy which prompted their enactment may be carried into effect. At the same time, it is equally the duty of the courts not to permit these humane laws to be prostituted and perverted to the purpose of enabling an unscrupulous debtor to avoid the payment of his honest obligations by resorting to their provisions as a mere subterfuge with no honest intention or purpose of occupying the land as a home.

Schoenheider v. Tuengel, 96 Wash. 103, 106-07, 164 P. 748 (1917).

Whether Buttnick resided at the J&M building and whether he did so with the intent that it be his primary residence were proper questions for the superior court to resolve. It did so correctly, based on the evidence before it and the applicable law.

### D

Buttnick next asserts that his declaration of homestead sufficiently supported the exemption claim. We disagree.

In order to be valid, a declaration of homestead must be in compliance with the statute. RCW 6.13.040(5); U.S. Fid. & Guar. Co. v. Alloway, 173 Wash. 404, 406-07, 23 P.2d 408 (1933). The failure to properly notarize a declaration of homestead renders the declaration invalid. Alloway, 173 Wash. at 407.

Buttnick's recorded declaration of homestead fails because it was not properly notarized. The trial court correctly concluded that because the recorded

- 12 -

homestead declaration was not notarized, it was deficient and did not operate to establish Buttnick's homestead.

E

Buttnick's obvious bad faith in asserting the homestead exemption claim also supports affirmance of the superior court's orders. "The homestead exemption statute cannot be used as an instrument of fraud and imposition"—the exemption "must be filed 'in good faith.'" Webster v. Rodrick, 64 Wn.2d 814, 816-18, 394 P.2d 689 (1964) (citing Barouh v. Israel, 46 Wn.2d 327, 331-32, 281 P.2d 238 (1955) ("No citation of authority is necessary for the rule that a declaration must be filed in good faith.")).

Our courts have never permitted a judgment debtor to use the exemption "as a sword to protect a theft." Webster, 64 Wn.2d at 816. If a property owner's illicit conduct can be traced back to the property claimed as a homestead, the owner's bad faith negates the homestead exemption. Webster, 64 Wn.2d at 818-19 (holding that an employee who embezzled funds, for the benefit of the marital home, from her employer could not execute a homestead exemption because the employee's illicit conduct could be traced to the property subject to the homestead exemption).

Buttnick's illicit conduct is traceable to the J&M building and such conduct invalidates his claim for a homestead exemption. On the eve of the sale that would have satisfied the Jolan Creditors' judgment against Buttnick, Buttnick asserted that the J&M building was his residence. Buttnick later admitted that he filed for the receivership and bankruptcy to frustrate the sale of the J&M building.

- 13 -

Further, Buttnick admitted that he intentionally concealed his claim that he was living in the J&M building from the Jolan Creditors because they were his "enemy" and needed to "suffer" for their "mistakes." Prior to these assertions and filings, Buttnick did not identify himself as an occupant of the building in deposition or written discovery requests. In fact, he specifically agreed not to encumber the property and, at the evidentiary hearing, defiantly refused to act in accord with the agreement he had made. The Jolan Creditors plausibly assert that they reasonably relied on Buttnick's written representation that he had a sufficient financial interest in the building, would sell the building to satisfy the 2012 judgment, and would not encumber the building to avoid paying the amount due. For his part, Buttnick dishonestly maneuvered to avoid paying the Jolan Creditors. Thus, any claim by Buttnick to a homestead exemption in the J&M building is invalid due to Buttnick's lack of good faith.[2]

### III

The Jolan Creditors assert that they should be awarded reasonable attorney fees and costs associated with this appeal based on the provisions in two contracts. We agree.

Generally, attorney fees "may be awarded only when authorized by a private agreement, statute, or a recognized ground of equity." Marine Enters., Inc. v. Sec. Pac. Trading Corp., 50 Wn. App. 768, 771, 750 P.2d 1290 (1988). If

---

[2] The Jolan Creditors also assert that Buttnick's homestead exemption claim should be set aside due to equitable and judicial estoppel. We need not reach these arguments.

contractual authority is the basis for an award of attorney fees at trial, that basis remains applicable on appeal. <u>Marine Enters.</u>, 50 Wn. App. at 774.

Here, both the underlying lease for the J&M Café[3] and the parties' 2012 settlement agreement[4] provide a basis for the Jolan Creditors' claim for an award of attorney fees. Upon proper application, a commissioner of our court will make an appropriate award.

Affirmed.

We concur:

---

[3] The lease agreement provides:
27.    <u>Costs and Attorneys' Fees</u>. In the event of litigation, arbitration, or other dispute resolution proceedings relating to this Lease or the relationship between the parties created by the Lease, the substantially prevailing party shall be awarded its reasonable costs, disbursements, investigative fees, expert witness fees, paralegal and attorneys' fees.

[4] The 2012 settlement agreement provides: "Buttnick agrees to indemnify the [Jolan Creditors] for any claims, fees, costs, or liability arising from this agreement, including any such claims, fees, costs or liability that arise if Buttnick files for bankruptcy."